Justin Augustine (CA Bar No. 235561)
Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Ste. 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 307
Facsimile: (415) 436-9683
lbelenky@biologicaldiversity.org
jaugustine@biologicaldiversity.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and THE BAY INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>KEN SALAZAR, Secretary of the Interior and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.  In this action Plaintiffs, the CENTER FOR BIOLOGICAL DIVERSITY, and THE BAY INSTITUTE, challenge the failure of Defendants, KEN SALAZAR, Secretary of the Interior, and UNITED STATES FISH AND WILDLIFE SERVICE (the "Service") (collectively "Defendants") to complete and publish a 12-month finding on the petition to uplist the Delta smelt from threatened to endangered under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA").

Complaint for Declaratory and Injunctive Relief                                                                 1

2. Plaintiffs submitted a petition to uplist the Delta smelt on March 8, 2006. In a letter to petitioners dated June 20, 2006, the Service acknowledged receiving the petition on March 9, 2006. Accordingly, the 12-month finding was due on March 9, 2007.

3. The petition outlined in explicit detail the severe decline of the Delta smelt population since it was listed as threatened under the ESA in 1993. The petition showed that Delta smelt are in critical condition due to reduced freshwater inflows, record-high water diversions, and harmful non-native species that thrive in the degraded Delta habitat. The petition also contained new analyses showing that recent record-high Delta water exports are related to the Delta smelt population decline - the five highest years of water exports from the Delta had occurred since 2000 and seasonal exports in the 2000s were up to 49 percent higher than in the early 1990s.

4. Since the petition was submitted, the Delta smelt population has continued to accelerate toward extinction. In 2007, the Delta Smelt Working Group, comprised of state and federal agency biologists, declared that the species is "critically imperiled" and that an "emergency response" is warranted. In 2008, numbers of Delta smelt found during surveys were the lowest in 42 years of surveys.

5. Defendants, on July 10, 2008, released a 90-day finding regarding Plaintiffs' petition, noting that the petition "presents substantial scientific or commercial information indicating that reclassification of the Delta smelt from threatened to endangered may be warranted. Therefore, [the U.S. Fish and Wildlife Service is] initiating a status review to determine if reclassifying this species as endangered under the Act is warranted." Defendants have failed to complete the status review, however, despite the fact it has now been over 44 months since Defendants received the petition.

6. Through this action, Plaintiffs seek an order declaring that Defendants' failure to complete their statutorily-mandated duty to process Plaintiffs' petition is a violation of the ESA and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. Plaintiffs further seek an order requiring Defendants to make the required 12-month finding by a date certain.

Complaint for Declaratory and Injunctive Relief 2

**JURISDICTION AND VENUE**

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief); 16 U.S.C. § 1540(c) and (g) (action arising under the ESA and citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act). As required by the ESA, 16 U.S.C. § 1540(g), Plaintiffs furnished Defendants with written notice regarding the violations alleged in this Complaint more than 60 days ago. Defendants have failed to remedy the alleged violations in that time. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

8. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) as Defendant Service maintains an office in this judicial district and the Delta smelt is found in this district.

**PARTIES**

9. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit corporation with offices in Alaska, Arizona, California, Illinois, Minnesota, Nevada, New Mexico, Oregon, Vermont, and Washington, D.C. The Center is actively involved in wildlife and habitat protection issues throughout the United States, and has members throughout the country, over 10,000 of whom reside in California. The Center's members and staff include individuals with various interests in the Delta smelt, ranging from educational to scientific, spiritual, and recreational interests. The Center's members and staff enjoy the biological, recreational, and aesthetic values of the San Francisco Bay-Delta, where the Delta smelt is found. The Center's members and staff have participated in efforts to protect and preserve the habitat essential to the continued survival of the Delta smelt. The Center brings this action on its own behalf and on behalf of its adversely affected members and staff.

10. Plaintiff THE BAY INSITUTE ("TBI") is a non-profit corporation based in Novato, California. TBI is a research, education, and advocacy organization dedicated to protecting and restoring the ecosystems of San Francisco Bay, the Sacramento-San Joaquin Delta, and the rivers, streams, and watersheds tributary to the estuary. TBI has approximately

1,300 members in California, who live primarily in the counties surrounding the San Francisco Bay and the Sacramento and San Joaquin Valleys. TBI's members use, on a continuing and ongoing basis, the San Francisco Bay, the Delta (collectively the "Bay-Delta"), and the rivers of the Central Valley for recreational, educational, spiritual, and conservation activities such as fishing, boating, swimming, aesthetic enjoyment, and nature study. They intend to continue to do so on an ongoing basis in the future. Some of TBI's members own or work for businesses that are wholly or partially dependent on the fisheries of the Bay and Delta. The decline of Delta smelt and the Delta ecosystem has had serious impacts on the fisheries that some TBI members depend on for commercial or recreational fishing.

11. Defendants' failure to take any action regarding the petition has prevented the necessary protective measures for the Delta smelt and its habitat. Plaintiffs' members and staff spend time in the Delta and are adversely affected by Defendants' refusal to uplist this species. Plaintiffs' members and staff have been, are being, and unless the specific relief requested is granted, will continue to be adversely affected and injured by Defendants' refusal to take action on the petition. Plaintiffs have no adequate remedy at law.

12. Defendant KEN SALAZAR, is the Secretary of the Department of Interior. The Secretary of the Interior ("Secretary") is the federal official charged with responsibility for decisions regarding listing species under the ESA. The Secretary has delegated responsibility for responding to listing petitions to the United States Fish and Wildlife Service. He is sued in his official capacity.

13. Defendant UNITED STATES FISH & WILDLIFE SERVICE ("Service") is an agency of the United States government, and is an agency within and under the jurisdiction of the Department of the Interior. Through delegation of authority from the Secretary, the Service administers and implements the ESA, and is legally responsible for the protection and management of the fish, wildlife and native plant resources of the United States through enforcement of the ESA. The Service has responsibility under the ESA over the species which is

the subject of this action. The Service has failed to take any action with regard to the petition, and has failed to meet the statutorily-mandated deadline for processing the petition.

## LEGAL BACKGROUND

14. The ESA is a federal statute whose purpose is to conserve endangered and threatened species and the ecosystems upon which these species depend. 16 U.S.C. § 1531(b). To this end, the ESA requires the Secretary to list as "threatened" or "endangered" those species of plants and animals that are facing extinction. 16 U.S.C. § 1533. A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

15. The listing process can begin either by citizen petition or by internal Service processes. In either case, a strict timeline applies once the process is initiated.

16. To the maximum extent practicable, within ninety days of receiving a petition to list a species, the Service must make a determination as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted," and publish that finding in the Federal Register. 16 U.S.C. § 1533(b)(3)(A).

17. Within one year of receiving a petition, the Secretary must issue a "twelve-month finding" making one of three determinations: (1) that the listing is "warranted," in which case the Service must also publish a proposed rule to list the species; (2) that the listing is "not warranted," in which case no further action is taken; or (3) that the listing is "warranted but precluded" by other listing actions of higher priority. 16 U.S.C. § 1533(b)(3)(B). The one-year finding is mandatory; there is no mechanism by which the deadline to make the finding may be extended. So while the ESA provides the Secretary with some very limited flexibility as to the making of the initial 90-day finding on the petition, the Secretary must comply with the mandatory 12-month deadline for making one of the above listed determinations.

18. Within one year of the publication of a proposed rule to list a species, the ESA requires the Secretary to render a final determination on the proposal. 16 U.S.C. §

1533(b)(6)(A)(i). At this point, the Secretary may list the species, withdraw the proposal, or, if there is substantial disagreement about the scientific data involved, delay a final determination for up to six months to solicit more scientific information. 16 U.S.C. § 1533(b)(6)(A)(i) & (B)(i). In any case, the Secretary must make a formal finding within one year of the initial twelve-month finding. 16 U.S.C. § 1533(b)(6)(A).

19. Where the Secretary has made a final determination to list a species as threatened or endangered, it must, to the maximum extent determinable, concurrently render a final decision concerning the designation of critical habitat for the species. 16 U.S.C. § 1533(a)(3) & (b)(6)(C).

20. The primary regulatory distinction between the "threatened" and "endangered" listing classifications relates to the applicability of Section 9's prohibition on take. The ESA directly applies Section 9's prohibitions only to species listed as "endangered." 16 U.S.C. § 1538. However, Section 4(d) of the ESA requires the Secretary to promulgate "protective regulations" where the agency deems them "necessary and advisable to provide for the conservation of such species," including regulations that apply any or all of the prohibitions of Section 9 to species listed as "threatened." 16 U.S.C. § 1533(d).

21. Shortly after the ESA was enacted, the Secretary promulgated a blanket regulation pursuant to Section 4(d) that, absent a separate species-specific rule, extended all of Section 9's protections for endangered species to all threatened species. 50 C.F.R. § 17.31(a). Because of this, the prohibitions of Section 9 and the processes for exemption from such prohibitions through an incidental take permit or an incidental take statement generally apply to both threatened and endangered species.

22. The Secretary has, however, in some instances, promulgated species-specific Section 4(d) rules exempting certain activities from the general take prohibition contained in 50 C.F.R. § 17.31(a). Activities that are permitted by a Section 4(d) rule are deemed to not violate Section 9 and 50 C.F.R. § 17.31(a), even though they may harm, injure, or even kill a threatened

species, and no incidental take permit or take authorization pursuant to an incidental take statement is required.

23.     Section 4(d) rules are only available to species listed as "threatened." If the species is listed as "endangered," otherwise prohibited take can only be permitted through an incidental take permit or incidental take statement.

24.     The Secretary also has discretion to issue a regulation at any time to prevent an "emergency posing a significant risk to the well being of any species." 16 U.S.C. § 1533(b)(7). Such an emergency regulation remains in effect for up to 240 days, at which time the Secretary must issue a final rule to continue the protection. Id.

25.     It is critical for the Service, which has been delegated the Secretary's responsibilities for listing under the ESA, to scrupulously follow the listing procedures and deadlines set forth by the ESA if species are to be provided the protections they need.

**FACTUAL BACKGROUND**

26.     "Delta smelt are endemic to (native and restricted to) the San Francisco Bay/Sacramento-San Joaquin Delta Estuary (Delta) in California, found only from the San Pablo Bay upstream through the Delta in Contra Costa, Sacramento, San Joaquin, Solano, and Yolo counties (Moyle 2002, p. 227). Their historical range is thought to have extended from San Pablo Bay upstream to at least the city of Sacramento on the Sacramento River and Mossdale on the San Joaquin River. They were once one of the most common pelagic (living in open water away from the bottom) fish in the upper Sacramento-San Joaquin Estuary (Moyle 2002, p. 230)." 73 Fed. Reg. 39639.

27.     Plaintiffs submitted a petition to uplist the Delta smelt on March 8, 2006. In a letter dated June 20, 2006, the Service acknowledged receiving the petition on March 9, 2006.

28.     The petition outlined in explicit detail the severe decline of the Delta smelt population since it was listed as threatened under the ESA in 1993. The petition explained that Delta smelt are in critical condition due to reduced freshwater inflows, record-high water diversions, and harmful non-native species that thrive in the degraded Delta habitat. The petition

also contained new analyses showing that recent record-high Delta water exports are related to the Delta smelt population decline - the five highest years of water exports from the Delta had occurred since 2000 and seasonal exports in the 2000s were up to 49 percent higher than in the early 1990s.

29. The petition also reported on recently published population viability analyses indicating that the species has a 50 percent probability of going extinct in the next 20 years.

30. Since the petition was submitted, the Delta smelt population has continued to accelerate toward extinction. The 2006 smelt abundance levels were the second lowest ever recorded. 2007 larval Delta smelt numbers were an order of magnitude lower than 2006 (which was a record low), and more young smelt were salvaged at the federal pumps than were caught in the surveys. The four years of lowest smelt abundance on record have been from 2005 to 2008. Numbers of Delta smelt found during surveys in 2008 were the lowest in 42 years of surveys.

31. A report released in February 2007 by the Public Policy Institute of California, *Envisioning Futures for the Sacramento-San Joaquin Delta*, concluded that the current management of smelt habitat is "dangerously unsustainable" and warned that the Delta "could become an environmental and economic disaster."

32. On July 10, 2008, the FWS released its 90-day finding which further discusses the dire situation faced by the Delta smelt:

> [W]ater diversions, particularly from the large Federal and State pumping stations in the southern portion of the Delta, can modify the smelt's habitat in three ways. First, they remove planktonic food organisms out of the water. Second, they diminish freshwater outflows, causing the mixing zone to move upstream and away from Suisun Bay where the best rearing habitat is located. Third, the large Federal and State pumps can actually halt and reverse flows in the southern Delta, potentially interfering with both the transport of plankton and smelt larvae downstream and with the spawning migration of adult smelt upstream (CBD *et al.* 2006, pp. 13, 14).
>
> [H]abitat destruction and modification, as well as direct impacts from water diversions, threaten the continued existence of delta smelt, as they did at the time of the original listing of the species. Record or near record low delta smelt abundance indices from 2002 through 2007 (Armor *et al.* 2005, p. 3; Bennett 2005, p. 2; CDFG 2008, pp. 1-2), indicate that these existing threats may now be more imminent than at the time of listing.

> [T]he petition points out that numerous changes have occurred since the time of the species' listing, and suggests that the regulatory mechanisms governing such changes have not provided adequate conservation for delta smelt. Given that delta smelt abundance indices from 2002 through 2007 have been at record lows (Armor *et al.* 2005, p. 3; Bennett 2005, p. 2; CDFG 2008, p. 1), we conclude that substantial information is presented in the petition to indicate that reclassification of delta smelt from threatened to endangered due to the inadequacy of existing regulatory mechanisms may be warranted.
>
> [W]e believe the petition provides substantial information indicating that a reclassification from threatened to endangered may be warranted. Specifically, substantial information was provided under Factor A (habitat loss, and water diversions), Factor D (the inadequacy of existing regulatory mechanisms), and Factor E (low population size).

33.     Since then, however, the FWS has continued to ignore its duty to issue a 12-month finding.

34.     In *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir. 2002), the Ninth Circuit explicitly held that a 12-month finding on a citizen petition to list a species under the ESA must in all cases be made within 12 months of receipt of the petition. As a result, the Service is currently in indisputable violation of the ESA, 16 U.S.C. § 1533.

35.     A 12-month finding is all the more urgent given the recent information which shows that an emergency situation clearly exists for the Delta smelt.  In fact, the four years of lowest smelt abundance on record have been from 2005 to 2008, and numbers of Delta smelt found in 2008 were the lowest in 42 years of surveys.

## CLAIM FOR RELIEF

## Violation of the Endangered Species Act

36.     Each and every allegation set forth in this Complaint is incorporated herein by reference as if set forth in full.

37.     Defendants have failed to make a 12-month finding on the petition to uplist the Delta smelt despite the fact it has now been over 44 months since the petition was filed. Accordingly, Defendants are in violation of Section 4 of the ESA for failure to perform their non-discretionary duty.  By failing to perform a non-discretionary duty under the ESA,

Defendants have acted in a manner that is arbitrary, capricious, or otherwise not in accordance with the law, in violation of the ESA, 16 U.S.C. §§ 1533 and 1540(g)(1)(C), and the APA, 5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs respectfully request that the Court:

1. Declare that Defendants are in violation of their mandatory duty under the ESA to make, and to publish in the Federal Register, a 12-month finding on the petition to uplist the Delta smelt;
2. Provide preliminary and permanent injunctive relief compelling Defendants to publish in the Federal Register a 12-month finding on the petition to uplist the Delta smelt by a date certain;
3. Retain continuing jurisdiction to review Defendants' compliance with all judgments and orders herein;
4. Make such additional judicial determinations and enter such additional orders as may be necessary to effectuate the foregoing;
5. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and
6. Provide such other relief as the Court deems just and proper.

Respectfully submitted,

DATED: November 13, 2009                    /s/ Justin Augustine

Justin Augustine (CA Bar No. 235561)
Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Ste. 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 307

Facsimile: (415) 436-9683
lbelenky@biologicaldiversity.org
jaugustine@biologicaldiversity.org

Attorney for Plaintiffs